STATE OF INDIANA          )          IN THE ALLEN SUPERIOR COURT
                          ) SS:
COUNTY OF ALLEN           )          CAUSE NO. 02D01-1303-PL-104

CHAPEL RIDGE INVESTMENTS, L.L.C.,              )
          Plaintiff,                           )
                                               )
vs.                                            )
                                               )
                                               )
PETLAND LEASEHOLDING COMPANY, INC,             )
an Ohio corporation; THE UNKNOWN OFFICERS,     )
DIRECTORS AND SHAREHOLDERS OF                  )
PETLAND LEASEHOLDING COMPANY, INC.,            )
an Ohio corporation; and PETLAND INC., an Ohio )
corporation.                                   )
          Defendants.                          )

## COMPLAINT

Comes now the Plaintiff, by counsel, and for its causes of action against the Defendants,

jointly and severally, alleges and says:

### Facts Relative to the Parties

1.      Plaintiff, Chapel Ridge Investments, L.L.C., an Indiana limited liability company, is in

the business of owning and leasing real property in Allen County, Indiana, and is the owner of

the Premises (defined herein) in the Lease (defined herein).

2.      Defendant, Petland Leaseholding Company, Inc., is an Ohio corporation, and at all times

relevant to the causes of action set forth in this Complaint was transacting business within the

State of Indiana ("Defendant PLC").

3.      Defendant, Petland, Inc., is an Ohio corporation, and at all times relevant to the causes

of action set forth in this Complaint was transacting business within the State of Indiana

("Defendant PET").

4.      Based upon information and belief, Defendant PET is the sole shareholder of Defendant

PLC.

5.      Based upon information and belief, Defendant PLC has never been capitalized, has never owned any assets, has never filed state or federal income tax returns, is insolvent, and was used to promote fraud, injustice and illegal activities in the State of Indiana.

6.      Based upon information and belief, Defendant PET was not authorized to do business in the State of Indiana at all times relevant to the causes of action set forth in this Complaint.

7.      Based upon information and belief, Defendant PLC was not authorized to do business in the State of Indiana at all times relevant to the causes of action set forth in this Complaint.

### Facts Relative to Default, Jurisdiction and Forum

8.      On or about May 13, 2009, Plaintiff and Defendant PLC entered into Shopping Center Lease for real property in Allen County, Indiana, commonly known as 10538 Maysville Road, Fort Wayne, Indiana 46835 ("Premises") ("Lease"). A copy of the Lease is attached hereto as Exhibit "A".

9.      The Lease was guaranteed by Defendant PLC pursuant to a Corporate Guarantee dated May 13, 2009 ("Guarantee"). A copy of the Guarantee is attached hereto as Exhibit "B".

10.     Section 23(e) of the Lease provides that the laws of the State of Indiana shall apply to these proceedings.

11.     Section 23(f) of the Lease provides that the Plaintiff is entitled to recover its costs and reasonable attorneys' fees incurred in enforcing the Lease.

12.     Section 23(g) of the Lease provides that all amounts not paid within ten (10) days after due date shall bear interest at the rate of twelve percent (12%) per annum until paid in full.

13.     The Guarantee provides that in any dispute involving the Lease or the Guarantee, the courts of the State of Indiana, Allen County, shall be the proper forum and have jurisdiction to ajudicate the dispute.

2

14.     On or about December 7, 2012, the Defendant PLC ceased paying rent and other obligations set forth in the Lease.

15.     On or about January 28, 2013, Defendant PLC vacated the Premises.

16.     On or about March 5, 2013, Plaintiff caused notice of default to be sent to Defendant PLC and Defendant PET, a copy of which is attached hereto as Exhibit "C" ("Notice").

17.     Defendant PLC has not cured the defaults set forth in the Notice and therefore is in default pursuant to the terms and conditions of the Lease.

18.     As of February 28, 2013, Defendant PLC owed to the Plaintiff rent and other obligations in the amount $63,240.01.

19.     Pursuant to Section 13 of the Lease, Landlord is entitled to recover from the Defendant PLC the amount of unpaid rent that had been earned as of January 28, 2013, plus the amount of unpaid rent that would have been earned after such date, less the amount of the fair market rental value of the Premises for the remainder of the Lease Term, plus any other amount including reasonable court, attorney, and collection costs, costs and expenses incurred in reletting all or any part of the Premises, including, but not limited to, brokers' fees and commissions, plus the costs and repairs reasonably necessary to relet all or any portion of the Premises necessary to compensate Plaintiff for all detriment caused by the default of Defendant PLC ("Damages").

### Cause of Action Number 1

20.     Defendant PLC is in default of the Lease and is liable to the Plaintiff for the Damages.

WHEREFORE, the Plaintiff prays that the Court enter judgment in its favor and against Defendant PLC in the amount of the Damages, as determined by the Court, and for all other relief proper in the premises.

### Cause of Action Number 2

21.     The corporate form of Defendant PLC was so ignored, controlled and manipulated that it was merely the instrumentality of Defendant PET, and that the misuse of the corporate form constitutes a fraud and promotes injustice, including, but not limited to:

21.1   At the time of the execution of the Lease and Guarantee, Defendant PLC and Defendant PET knew that Defendant PLC had no assets, was insolvent, and was unable to meet its obligations set forth in the Lease and the Guarantee;

21.2   At all times after execution of the Lease, Defendant PET made all the payments required under the Lease, and such payments were not made by Defendant PLC;

21.3   Defendant PLC was never capitalized;

21.4   Defendant PLC did not own any assets;

21.5   Defendant PLC did not file state or federal income tax returns; and

21.6   Defendant PLC was and is the alter ego of Defendant PET.

22.     The Unknown Officers, Directors, and Shareholders of Defendant PLC, and Defendant PET are jointly and severally liable to the Plaintiff for the Damages.

WHEREFORE, the Plaintiff prays that the Court enter judgment in its favor and against the Unknown Officers, Directors, and Shareholders of Defendant PLC, and Defendant PET in the amount of the Damages, as determined by the Court, and for all other relief proper in the premises.

HAWK, HAYNIE, KAMMEYER & CHICKEDANZ

Thomas M. Gallmeyer, 7033-02

116 East Berry Street, Suite 302
Fort Wayne, IN 46802
Telephone: 260-422-1515

4

## SHOPPING CENTER LEASE

THIS LEASE (the "Lease") dated _____, ("The Effective Date") is by and between the Landlord and Tenant as identified in Section 1 below.

### RECITALS:

A.     Landlord desires to lease certain space to Tenant, as more fully set forth herein, and Tenant desires to take and lease such space from Landlord ("Premises").

B.     The Premises are an integral part of that certain retail center ("Shopping Center") as defined in Section 1 below.   The Shopping Center is described and/or depicted on Exhibit A attached hereto and incorporated herein by this reference ("Site Plan"). The Premises are shown cross-hatched on the Site Plan.

NOW, THEREFORE, for and in consideration of the rents reserved hereunder and the terms and conditions hereof, Landlord hereby rents, demises and leases to Tenant, and Tenant takes and leases from Landlord, the above-described Premises all upon the following terms and conditions:

1.     **BASIC LEASE PROVISIONS.**

|     |     |     |
| --- | --- | --- |
| (a) | Landlord: | **CHAPEL RIDGE INVESTMENTS, LLC**<br>**C/O: CBRE/Sturges**<br>**202 W Berry Street, Suite 800**<br>**Fort Wayne, IN 46802** |
| (b) | Tenant: | Petland Leaseholding Company, Inc.<br>C/O: Greg Hudson, Treasurer<br>250 Riverside Street<br>Chillicothe, OH 45601 |
| (c) | Guarantor: | Petland Leaseholding Company, Inc., an Ohio Corporation<br>C/O: Greg Hudson, Treasurer<br>250 Riverside Street<br>Chillicothe, OH 45601 |
| (d) | Shopping Center: | Chapel Ridge I – Building B<br>10530-10546 Maysville Road<br>Fort Wayne, IN 46825 |
| (e) | Premises: | Store Unit #10538 containing approximately **6,088** square feet, having a street address of 10538 Maysville Road, Fort Wayne, IN 46835 and depicted on Exhibit A |
| (f) | Lease Term: | Approximately **Ten (10)** years commencing on the Base Rent Commencement Date and ending on the Expiration Date. |

1



EXHIBIT

"A"

(g)   Effective Date:          The date this Lease is mutually executed by Landlord and Tenant.

(h)   Delivery Date:           Landlord shall deliver the premises on the Effective Date.

(i)   Base Rent
      Commencement Date:    The Date that is __Ninety (90)__ days after the Delivery Date.

(j)   Expiration Date:         The __Tenth (10th)__ Anniversary of the Base Rent Commencement Date.

(k)   Options for Extension:   Two (2) Options to Extend for Five (5) Years each ("Extension Periods").

(l)   Security Deposit:        $5,500.00 – Due on the Effective Date.

(m)   Base Rent:

| Year | RENT PER S.F. | ANNUAL RENT | MONTHLY RENT |
|------|---------------|-------------|--------------|
| 1 | $9.00 | $54,792.00 | $4,566.00 |
| 2 | $10.00 | $60,880.00 | $5,073.33 |
| 3 | $11.00 | $66,968.00 | $5,580.67 |
| 4 | $12.00 | $73,056.00 | $6,088.00 |
| 5 | $13.00 | $79,144.00 | $6,595.33 |
| 6 | $14.00 | $85,232.00 | $7,102.67 |
| 7 | $14.00 | $85,232.00 | $7,102.67 |
| 8 | $14.00 | $85,232.00 | $7,102.67 |
| 9 | $14.00 | $85,232.00 | $7,102.67 |
| 10 | $14.00 | $85,232.00 | $7,102.67 |
| | | | |
| 1st Extension Period | $15.50 | $94,364.00 | $7,863.67 |
| | | | |
| 2nd Extension Period | $17.00 | $103,496.00 | $8,624.67 |

2

(n)    Permitted Use:    Tenant shall be permitted to use the premises for a retail Pet Store, including the sale of live animals, grooming, pet food, and accessories. Tenant shall use the premises for no other purpose without Landlord's prior written consent.

(o)    Exclusive Use:    Landlord shall not lease space within Shopping Center to another facility whose primary use competes directly with Tenant's "permitted use" (above).

(p)    Tenant's
       Proportionate Share:    Tenant's Proportionate Share for calculating "Additional Rent" Charges shall be as follows:

For Charges calculated solely for Chapel Ridge I – Building B = (6,088 s.f. / 36,532 s.f.) = **16.67%**.

For Charges calculated both Chapel Ridge I – Building A and Building B = {6,088 s.f. / (10,772 + 36,532) s.f.} = **12.87%**.

For Charges calculated for Chapel Ridge I – Building A, Building B, and Common Area = **7.25%**

## 2.    PREMISES, SHOPPING CENTER, COMMON AREA, AND PARKING.

**2.1 Premises.** Landlord hereby leases, rents, and demises to Tenant, and Tenant hereby accepts from Landlord subject to and with the benefit of the terms and provisions of this Lease, the Premises.

**2.2 Shopping Center.** The depiction of the Shopping Center on Exhibit A constitutes a representation by Landlord of the current layout of the Shopping Center. However, subject to the terms and conditions of this Lease, Landlord reserves the right from time to time to change the size, layout, and dimensions of the Shopping Center and any part thereof; locate, relocate, alter, and/or modify the number and location of buildings, building dimensions, number of floors in any of the buildings, parking areas, store dimensions, identity and type of other stores and of other tenants and tenancies, the nature of the businesses, activities, and uses to be conducted, and the Common Area located from time to time in or on the Shopping Center or any part thereof; provided, however, in no event shall Landlord be permitted to relocate Tenant or make structural alterations or improvements to the Premises or allow any structures in the area cross-hatched on **Exhibit A** attached hereto nor shall Landlord otherwise materially or adversely affect Tenant's use of, operations in, or access to the Premises.

3

**2.3 Common Area**. Subject to the provisions of this Lease, Landlord shall maintain control over the Common Area, but Tenant and its employees, contractors, agents, and invitees are, except as otherwise specifically provided for in this Lease, authorized, empowered, and privileged to use the Common Area in common with other persons during the Lease Term. The term "Common Area" refers to all areas within the exterior boundaries of the Shopping Center which are now or hereafter under the control of Landlord, but made available for general use, convenience, and benefit of Tenant and other persons entitled to occupy space in the Shopping Center, which area shall include, but not be limited to, parking areas, driveways, exterior lighting, open (but not enclosed) malls, walkways, landscaped and planted areas, and other facilities available for joint nonexclusive use, all as they may from time to time exist and be available to all the tenants in the Shopping Center, their employees, agents, customers, licensees, and invitees.

**2.4 Parking**. Tenant shall have the right to non-exclusive use of all parking spaces in the Shopping Center. If an employee parking area is designated by Landlord, Tenant shall instruct its employees to park in the designated area.

**3.      TERM; LANDLORD'S AND TENANT'S WORK.**

**3.1 Lease Term.**

**(a)** Base Rent Commencement Date. This Lease shall be for the term set forth in Section 1 above (hereinafter referred to as the "Lease Term") and shall commence on the Base Rent Commencement Date specified in Section 1 above. The terms and conditions of this Lease shall apply on and after the Effective Date. The Lease Term, including Tenant's rental obligations under this Lease shall commence on the Base Rent Commencement Date and shall terminate on the expiration date as set forth in Section 1 above.

**(b)** Extension Terms. If Tenant is granted one or more Extension Periods in Section 1, each said right to extend for each such Extension Period (the "Option(s)") may be exercised only in the event Tenant is not in default beyond any applicable notice and cure period at the time each said Option right is exercised and provided, further, that the Option right for any Extension Period cannot be exercised unless the Option for the immediately preceding Extension Period, if any, has been exercised. The phrase "Lease Term" as used in this Lease shall include the term of this Lease as extended by Tenant pursuant to this Section. To exercise the/each Option(s) described in the Section above, Tenant shall notify Landlord in writing no later than One Hundred and Twenty (120) calendar days prior to the expiration of the initial Lease Term or the Extension Period then expiring, if any. In the event Tenant properly exercises its Option as provided herein: (1) except for the Option just exercised and the Base Rent, all of the terms and conditions of this Lease shall apply during the Extension Period(s) (except the Option previously exercised), including, but not limited to, Tenant's obligation to pay Additional Rent and other charges and expenses provided for in the Lease; (2) the particular Option exercised by Tenant shall terminate and be of no further force and effect and may not be exercised again by Tenant; (3) no rental concession, reduced or free Base Rent, Tenant Improvement Allowance, or other concession previously granted Tenant by Landlord shall be due or payable to Tenant during or with respect to such Extension Period; and (4) Base Rent during the particular Extension Period shall be determined as set forth in Section 1.

**3.2 Landlord's Work and Tenant's Work.** If Exhibit B is attached hereto, Landlord and Tenant shall perform the work required of them as specified in, and pursuant to, the terms and provisions of the Description of Landlord's Work/Tenant's Work in Exhibit B. If so provided in Exhibit B, Landlord shall reimburse Tenant a Tenant Improvement in the amount and payable at the time(s) set forth in Exhibit B.

4

### 3.3 Delivery of Premises.

(a)    Delivery by Landlord.  If Exhibit B provides for Landlord's Work, Landlord covenants and agrees to cause the construction of Landlord's Work to be undertaken promptly, to be performed and completed diligently and continuously, in a good and workmanlike manner and in compliance with all applicable laws, codes, rules and regulations, and to cause the Premises and surrounding area to be delivered, according to the terms and conditions of Exhibit B, with all Common Area and Shopping Center improvements complete by the Delivery Date specified in Section 1. In the event Landlord fails to deliver the Premises by the Delivery Date, the obligation to pay Base Rent and Additional Rent shall be extended beyond the Base Rent Commencement Date set forth in Section 1, one (1) day for each one (1) day of such delay and the Lease Term shall be extended by the same amount.  In the event Landlord fails to deliver the Premises within one hundred twenty (120) days of the Delivery Date, Tenant may elect to either (i) terminate this Lease and receive a refund of any and all amounts previously paid by Tenant to Landlord or (ii) continue to accrue the one (1) for one (1) extension of the Base Rent Commencement Date as set forth above.

(b)  Acceptance of Premises.  Landlord shall deliver possession and control of the Premises to Tenant in compliance with Exhibit B and structurally sound and water tight, free of structural or latent defects, free of Hazardous Materials, and in compliance with all federal, state and local laws, codes, ordinances, rules and regulations, including, without limitation, the ADA.  In no way shall Tenant's acceptance of the Premises limit Landlord's liability for Hazardous Materials, or structural or latent defects.  Upon delivery of the Premises to Tenant, Landlord and Tenant shall coordinate a "walk through" of the Premises and Landlord and Tenant shall complete a form indicating any deficiencies then apparent ("Punch List").  Landlord shall promptly commence and diligently prosecute until completed the items set forth in the Punch List.  Landlord's obligation and/or liability to Tenant for deficiencies shall be limited to the correction of the noted deficiencies set forth on the Punch List, which correction shall be made to the extent required for compliance with Landlord's Work as set forth in Exhibit B. If no Exhibit B is attached or no Landlord Work is specified in Exhibit B, Tenant shall be deemed to have accepted the Premises in as is condition.

**3.4    Landlord's Title**.  Landlord covenants that upon commencement of the initial Lease Term, Landlord will own and hold fee simple title in and to the Shopping Center and Premises and full right and authority to make and execute this Lease; that to the best of Landlord's knowledge, the Premises are free and clear of and from all liens, restrictions, leases, encumbrances, laws, ordinances, governmental rules, regulations, title restrictions, zoning, or other matters (whether recorded or unrecorded) which would materially and adversely restrict or prevent Tenant's operation of a retail store for the uses set forth in Section 1 above or would otherwise materially increase Tenant's obligations under this Lease and Landlord further covenants that it shall not enter into any that do so.

5

4.   **RENT**.

   **4.1 Base Rent.** Tenant shall pay to Landlord, without notice or demand and without any offset or deduction, except as otherwise provided herein, as fixed annual minimum rent the Base Rent specified in Section 1 above, which Base Rent shall be paid in monthly installments in advance on or before the first (1st) day of each calendar month of the Lease Term commencing with the Base Rent Commencement Date and shall be considered delinquent if not so paid on or before the first (1st) day of each month.  If the Lease Term commences or expires on a day other than the first or last day of a calendar month, as applicable, the Base Rent for such month shall be a prorated portion of the monthly Base Rent based upon a thirty (30) day month.  In no event shall Tenant be obligated to pay Base Rent more than one month in advance.

   **4.2 Additional Rent.** The term "Additional Rent" shall be deemed to be Tenant's proportionate share of Real Estate Taxes, Common Area Costs and the cost of Landlord's Insurance Policies as further described in subsections (a), (b) and (c) below.  Tenant's proportionate share is set forth in Section 1.

      **(a)** Taxes.  In addition to the Base Rent and commencing on the Base Rent Commencement Date, Tenant shall reimburse Landlord for Tenant's proportionate share of all "Real Estate Taxes" including all real estate taxes and assessments, whether special or general, that are levied upon and/or assessed against the Premises individually or the Common Area or the Shopping Center and the reasonable costs of professional consultants and/or counsel actually retained for the subject property and for which work was performed and documented related to analyzing tax bills and prosecuting any protests, refunds, and appeals for the period covered during the Lease Term; provided, however, Tenant shall receive a proportionate refund and reduction in Real Estate Taxes if Landlord is successful in such protest or appeal.

      **(b)**   Common Area Costs.   The term "Common Area Costs" means out-of-pocket costs reasonably and actually incurred for the operation, maintenance, and repair of the Common Area, and Management and supervision thereof.  Common Area Costs shall include, but not be limited to, repairing the parking area (but not repaving or putting a new asphalt layer thereon), restriping and repainting the parking areas, cleaning, sweeping, and other janitorial services, sanitation, Association Dues, management fees, snow and ice removal, maintenance of refuse receptacles, maintaining and replanting existing landscaping (including pruning and trimming to preserve the existing view corridor), maintaining directional signs and other markers and upkeep of lighting and other utilities.  "Common Area Costs" shall not include costs attributable to original development, costs attributable to seeking and obtaining new tenants or lease extensions, or to enforcing leases against tenants in the Shopping Center, costs that are reimbursed to Landlord by tenants as a result of provisions contained in their specific leases, costs for alterations and additions that are in the nature of new improvements or facilities, costs which are properly capitalized under generally accepted accounting principles.

         Commencing upon the Base Rent Commencement Date, Tenant shall pay to Landlord, on or before the first day of each calendar month during the Lease Term, Tenant's proportionate share of the Common Area Costs based upon Landlord's reasonable good faith estimates, subject to readjustments as hereinafter provided.  Notwithstanding anything in the Lease to the contrary, Tenant's Common Area Costs shall not increase by more than 5% per year, non-cumulative.

      **(c)** Insurance.  Commencing upon the Base Rent Commencement Date, Tenant shall reimburse Landlord for Tenant's proportionate share of the cost of Landlord's Insurance Policies as described in Section 12.

6

(d)     Payment of Additional Rent.  Landlord shall at the beginning of the Lease Term and at the beginning of each calendar year submit to Tenant a reasonably detailed statement indicating Landlord's monthly and annual estimates of Tenant's proportionate share of Common Area Costs, Real Estate taxes and Insurance Costs.  Tenant shall pay to Landlord on the first (1st) day of each month after receipt of such statement (until receipt of a succeeding statement) Tenant's monthly proportionate share of Common Area Costs, Real Estate taxes and Insurance Costs.  Landlord reserves the right, but not the obligation, to revise Landlord's estimation of Tenant's proportionate share of the costs: provided, however, that (i) Landlord may not make more than one (1) revision in any calendar year, and (ii) Tenant shall commence to pay such revised amounts no sooner than thirty (30) days after Tenant's receipt of written notice thereof from Landlord.  Within ninety (90) days following the end of each calendar year, Landlord shall furnish Tenant with a statement, certified as true and correct by an officer or management agent of Landlord, showing the total of such costs for the calendar year just expired and the amount of Tenant's proportionate share of such costs and payments made by Tenant during such calendar year under this Lease.   Landlord's statement shall include supporting documentation for such costs.  If Tenant's proportionate share of such Common Area Costs for such calendar year shall exceed Tenant's payments as shown on such statement, then Tenant shall, within thirty (30) days after receipt of such statement, pay the difference to Landlord.  If the statement indicates an overpayment by Tenant, then Tenant shall be entitled either (i) to receive a refund from Landlord within thirty (30) days after receipt of such statement or, (ii) in the event Landlord fails to make such refund, to credit such excess against payments becoming due under this Lease or any other payment obligations under this Lease.

(e) Late Charge.  Tenant shall pay to Landlord a late charge of five percent (5%) of any amount of Base Rent or Additional Rent that is not paid within ten (10) days after its due date.

5.     USE.   Tenant may use the Premises in compliance with all applicable laws for any business or purpose as set forth in Section 1 above.  Tenant agrees to comply with the declarations, covenants, conditions, restrictions and easements of record, if any, with respect to the Shopping Center referenced in Section 1 above, provided, however, it shall be Landlord's responsibility to obtain any consents or approvals from third parties (other than governmental permits associated with Tenant's Work or signage) that may be required or necessary for Tenant's construction, signage, occupancy, use and/or operations in the Premises and the Shopping Center. Tenant shall not do anything which may unreasonably obstruct or interfere with the rights of other tenants, owners, or occupants of the Shopping Center (and Tenant shall take all reasonable action to prevent odors, emissions, fumes, liquids, other substances or excessive noise from escaping or extending beyond the Premises), nor shall Tenant use or allow the Premises to be used for any unlawful purpose.  Tenant shall not produce or cause to be produced, excessive waste in or upon the Premises, and shall refrain from using or permitting the use of the Premises or any portion thereof as living quarters, sleeping quarters, or lodging.  No auction, fire, bankruptcy, "going out of business" or other distress sale of any nature may be conducted on the Premises without the prior written consent of Landlord.

Tenant will use the Premises for the conduct of its business on and during the same business days and hours as are customarily observed by comparable businesses.

If so provided in Section 1 above, during the Lease Term, Tenant's permitted use shall be exclusive in the Shopping Center.  In the event of a breach of the foregoing exclusive, Tenant shall have the right (i) to terminate this Lease upon sixty (60) days' prior written notice to Landlord, (ii) to abate the Base Rent by fifty percent (50%), and/or (iii) to pursue any and all remedies at law or in equity.

7

6.    MAINTENANCE OF PREMISES.

(a) Tenant's Responsibilities.  Tenant shall at all times throughout the Lease Term, at its sole cost and expense, keep the interior of the Premises, including the interior walls and nonstructural portions of the Premises, as well as exterior doors and entrances, all windows, floor coverings, sills, door closures, moldings, trim of all doors and windows, partitions, door surfaces, ceilings, fixtures, and equipment (including lighting), in good order, condition, and repair.  Without limiting the generalities thereof, Tenant shall keep the glass of all windows, doors, and showcases clean and presentable; immediately replace all broken glass in the Premises; provide all routine (at least semi-annually) service/maintenance/repair of all HVAC systems serving the Premises; keep all plumbing exclusively serving and within the Premises (including pipes, drains, toilets, basins, and water heaters) reasonably clean and in a good state of repair; and keep all utilities exclusively serving the Premises, including circuit breaker, panel box, and Tenant's meters within the Premises, in a good state of repair.

(b) Landlord's Responsibilities.   Landlord covenants and agrees, at its expense without reimbursement or contribution by Tenant, to keep, maintain in first class condition, and repair, and replace (if necessary), foundations, exterior surfaces and paint, plumbing system to the point of distribution within the Premises, electrical system to the point of distribution within the Premises, utility lines and connections to the point of distribution within the Premises, sprinkler mains and monitoring systems, if any, all structural systems, including without limitation, the roof, roof membrane, roof covering (including interior ceiling, inventory and other personal property if damaged by leakage), load bearing walls, floors, slabs, and masonry walls. Furthermore, Landlord shall be responsible for any major component (in excess of $1,000.00 per occurrence) replacement of the HVAC systems at Landlord's sole cost and expense, provided, however, that Tenant has adequately provided its routine service of said HVAC systems as required above.

7.    UTILITIES AND SERVICES.  Tenant shall pay before delinquency, at its sole cost and expense, all charges for water, gas, heat, electricity, power, telephone service, trash removal, sewer service charges, and sewer rentals charged or attributable to the Premises, and all other services or utilities used in, upon, or about the Premises by Tenant or any of its subtenants, licensees, or concessionaires from the Delivery Date and throughout the Lease Term hereof.  Landlord shall not be liable to Tenant in damages or otherwise if the utilities or services are interrupted or terminated because of necessary repairs, installations, improvements, or any cause beyond Landlord's reasonable control, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder.

8.    ALTERATIONS.  Except for Tenant's Work as described in Exhibit B and any nonstructural interior alterations, additions, or improvements (including, without limitation, changing color schemes, installing new countertops, flooring, wall covering, and modifying the layout of Tenant fixtures), Tenant shall not make any alterations, additions, or improvements in or to the Premises, including, but not limited to, penetration of the roof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. Any such alterations, additions, or improvements consented to by Landlord, including roof penetration, shall be made at Tenant's sole cost and expense. Tenant shall secure any and all governmental permits, approvals, or authorizations required in connection with any such work in or to the Premises and shall defend, indemnify, and hold Landlord harmless from and against any and all liability, costs, damages, expenses (including reasonable attorneys' fees), and any and all liens resulting therefrom.  On the last day of the Term of this Lease all alterations, additions, and improvements, except trade fixtures, appliances, and equipment which do not become a part of the Premises, shall immediately become the property of Landlord.

8

9.      **LIENS AND ENCUMBRANCES.**  Tenant shall keep the Premises and the Shopping Center free from any liens arising out of any work performed, materials furnished, or obligations incurred by Tenant.  Tenant retains the right to contest any lien or encumbrance upon the Premises provided that Tenant complies with all statutory obligations required to contest such liens.  Tenant's obligations regarding liens shall be satisfied if during any period that a lien is disputed Tenant provides a bond (or other similar security) sufficient for the satisfaction of the lien together with costs and interest.  Landlord shall also keep the Premises and the Shopping Center free from any liens arising out of any work performed, materials furnished, or obligations incurred by Landlord.  Tenant shall not cause or suffer to be placed, filed, or recorded against the title to the Premises or the Shopping Center, or any part thereof, any mortgage, deed of trust, security agreement, financing statement, or other encumbrance except for a memorandum of lease.

10.     **ASSIGNMENT AND SUBLETTING.**  Tenant shall not assign, transfer, mortgage, pledge, hypothecate, or encumber this Lease or any interest therein, nor sublet the whole or any part of the Premises, collectively "Assignment," without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  If Landlord's consent is required for an assignment, then Landlord's consent shall be deemed to have been given unless Landlord notifies Tenant in writing of the reasons for disapproval within thirty (30) business days after receipt of the request.  Irrespective of Landlord's consent, Tenant and Guarantor shall remain liable for the full and complete performance of the terms and conditions of the Lease to be performed by the assignee.  Tenant may assign this Lease or sublet all or any portion of the Premises to any parent, subsidiary, affiliate or entity controlling, controlled by, or under common control with Tenant, or to any qualified franchisee of Petland, Inc.; such franchisee shall be required to submit personal financial statements acceptable to Landlord and execute a personal guarantee for the remaining obligation of the lease term. At such time a franchisee executes a personal guarantee Landlord agrees to subordinate its Security Interest, referenced in Section 23(h), to Tenant's financial institution, if requested.

11.     **INDEMNIFICATION.**  Except to the extent of the negligence or willful act or omission of Landlord or its employees, agents, tenants, or contractors/subcontractors, Tenant agrees to save and hold Landlord and Landlord's officers, directors, and/or partners harmless from and against any and all losses, damages, liability, or expenses (including reasonable attorneys' fees) resulting from, claimed by or against, or incurred by Landlord, arising from any injury to any person, or loss of or damage to any property, caused by or resulting from any negligence or willful acts or omissions of Tenant or any officer, agent, contractor, or employee of Tenant in or about the Premises.

        Except to the extent of the negligence or willful misconduct of Tenant or its employees, agents, or contractors/subcontractors, Landlord does hereby agree to indemnify, defend and save harmless Tenant and its agents, officers, directors, employees and contractors/subcontractors from all claims, actions, demands, damages, injuries, injunctions, suits, fines, penalties, costs and expenses and liability whatsoever, including reasonable attorney's fees, occurring within the Common Areas or arising from or caused in whole or in part by any negligent or intentional act or omission of Landlord, its agents, contractors/subcontractors, servants, employees, tenants, or invitees.

12.     **INSURANCE.**

        **Landlord's Insurance.**  Landlord will carry and maintain general liability and property insurance as set forth herein.   Landlord agrees to carry during the Lease Term commercial general liability insurance ("Landlord's Liability Insurance") with a combined single limit of not less than ONE MILLION DOLLARS

9

($1,000,000.00) per occurrence, insuring against any and all liability of Landlord with respect to the ownership, operation and/or use of the Shopping Center. Landlord also agrees to carry during the Lease Term special form – causes of loss property insurance covering the building of which the Premises are a part for the full replacement value thereof as may be determined from time to time during the Lease Term insuring the improvements and betterments located in the Shopping Center, including the Premises and all appurtenances thereto (excluding Tenant's personal property, trade fixtures and equipment) ("Landlord's Property Insurance"). Landlord's Liability Insurance and Landlord's Property Insurance shall collectively be referred to herein as "Landlord's Insurance Policies." Landlord shall, upon request, furnish Tenant a certificate of such Landlord's Insurance Policies.

**Tenant's Insurance.** Tenant shall, during the entire Lease Term, keep in full force and effect a policy or policies of commercial general liability insurance and property damage insurance with respect to the Premises and the business (including any applicable business loss insurance coverage relative to the Premises) operated by Tenant, and any sublessee of Tenant in the Premises, in which the combined single limit of liability shall be not less than ONE MILLION DOLLARS ($1,000,000.00). Said policy shall include Landlord and Landlord's lender as additional insured's and contain a clause that the insurer shall endeavor to not cancel or change the insurance coverage limits without first giving Landlord thirty (30) days' prior written notice, except cancellation for nonpayment of premium, in which case only ten (10) days' prior written notice shall be required. The above-described limits of liability shall be adequate so long as Tenant also maintains an umbrella policy of insurance with limits of liability of not less than THREE MILLION DOLLARS ($3,000,000.00). Should Tenant not maintain an umbrella policy with such limits, then the limits in Tenant's liability insurance shall be increased to TWO MILLION DOLLARS ($2,000,000.00).

**Waiver of Subrogation.** Landlord and Tenant hereby mutually release each other from liability and waive all right of recovery against each other for any loss or damage to property in or about or constituting a part of the Premises or the Shopping Center, as the case may be, to the extent such loss or damage is required under this Lease to be, or is actually, insured against under the injured party's policy, including any "all risk" endorsements thereof, whether due to negligence or any other cause. Either Landlord or Tenant shall, at the request of the other party, execute and deliver to such requesting party a waiver of subrogation in the form and content as reasonably required by the requesting party's insurance carrier. This waiver shall take priority over any indemnity obligations and other liabilities or obligations of the parties under this Lease and apply notwithstanding such provisions. This waiver also applies to each party's directors, officers, employees, and agents.

**13.     DEFAULT BY TENANT.** The occurrence of any one or more of the following events shall constitute a default of this Lease by Tenant:

The failure by Tenant to make any payment of Base Rent, Additional Rent, or any other payment required to be made by Tenant hereunder, within fifteen (15) days following its due date;

The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than payment of Rent, where such failure shall continue for a period of thirty (30) days after Tenant's receipt of written notice thereof by Landlord provided, that in the event such cure reasonably requires more than thirty (30) days to complete, then Tenant shall not be in default if Tenant shall promptly commence the cure of such default and diligently pursue such cure to completion; or

10

The making by Tenant of any general assignment or general arrangement for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days of filing); or the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days after appointment of said trustee or receiver, or the filing of a petition for the appointment of the same, whichever shall first occur.

Landlord shall have the following remedies if Tenant is in default. These remedies are not exclusive but are cumulative and in addition to any remedies now or hereafter allowed by law or in equity. Landlord may terminate this Lease and/or Tenant's right to possession of the Premises at any time after a Tenant default. No act by Landlord other than giving written notice to Tenant shall terminate this Lease. Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of this Lease. Upon termination of this Lease or of Tenant's right to possession, Landlord shall have the right to recover from Tenant the amount of unpaid rent that had been earned at the time of such termination, the amount of unpaid rent that would have been earned after the date of such termination less the amount of the fair market rental value of the Premises for the remainder of the Lease Term, and any other amount, including reasonable court, attorney, and collection costs, costs and expenses incurred in reletting all or any part of the Premises, including, but not limited to, brokers' fees and commissions, and the costs of repairs reasonably necessary to relet all or any portion of the Premises necessary to compensate Landlord for all detriment proximately caused by Tenant's default.

**14.    DAMAGE BY FIRE OR OTHER CASUALTY.**  If fire or other casualty insurable under a special form- causes of loss policy of insured required to be carried (or otherwise carried) by Landlord covering the Premises shall render the whole or any material portion of the Premises untenantable, and if the Premises can reasonably be expected to be repaired and restored to their condition existing immediately prior to the casualty within one hundred eighty (180) days from the date of such event, then Landlord shall repair and restore the Premises to their condition prior to the fire or other casualty within such one hundred eighty (180) day period (subject to delays for causes beyond Landlord's reasonable control such as delays due to issuance of building permits or obtaining of insurance proceeds provided Landlord diligently pursues the same) and notify Tenant in writing that it will be doing so, such notice to be given within ninety (90) days from the date of such damage or destruction, and this Lease shall remain in full force and effect without abatement. If fire or other casualty insurable under a special form-causes of loss policy of insurance required to be carried by Landlord covering the Premises shall render the whole or any material portion of the Premises untenantable and the Premises cannot reasonably be expected to be repaired and restored to their condition existing immediately prior to the casualty, within one hundred eighty (180) days from the date of such event, or if an uninsurable casualty shall render the whole or any portion of the Premises untenantable, then Landlord or Tenant, by notice in writing to the other, given within ninety (90) days from the date of such damage or destruction, may terminate this Lease effective upon a date within thirty (30) days from the date of such notice. In the event Landlord is required to restore or repair the Premises within the one hundred eighty (180) day period set forth above, then Landlord, upon Tenant's reopening of the Premises for business with the public, shall provide Tenant with one (1) day of free rent for each one (1) day that the repairs exceeded one hundred eighty (180) days. In the event that such damage or destruction cannot be repaired within two hundred forty (240) days from the date of such event, then Tenant, at its option, by thirty (30) day written notice to Landlord, may terminate this Lease which shall be effective upon Landlord's receipt of such notice.

11

If neither party terminates this Lease pursuant to its rights herein, then Landlord shall repair and restore the Premises and the Shopping Center as the case may be to their condition prior to the damage or destruction within that time period reasonably necessary for such repair and restoration (subject to delays for causes beyond Landlord's reasonable control such as delays due to issuance of building permits or obtaining of insurance proceeds provided Landlord diligently pursues the same).

Notwithstanding anything to the contrary herein contained, in the event the Premises shall be damaged or destroyed by fire or otherwise in excess of thirty percent (30%) of the full replacement cost of the Premises during the final year of the Lease Term (unless Tenant has exercised an Option to extend the Term as provided for herein, either party shall have the option to terminate this Lease as of the date of such damage or destruction by giving written notice to the other party within ninety (90) days following the date of such damage or destruction.

## 15.   EMINENT DOMAIN.

If all of the Premises are taken by the power of eminent domain exercised by any governmental or quasi-governmental authority, this Lease shall terminate as of the earlier of the date Tenant is required to vacate the Premises, or the date title passes to the condemning authority, and upon either such date of termination, all Base Rent, Additional Rent, and other costs due hereunder shall be paid and prorated to that date. The term "eminent domain" shall include the taking or damaging of property by, through, or under any governmental or quasi-governmental authority, and any purchase or acquisition in lieu thereof, whether or not the damaging or taking is by the government or any other person.

In the event of condemnation of more than ten percent (10%) of the Premises, or parking such that the parking ratio is reduced below applicable code requirements, or any access to the Shopping Center, Tenant shall have the right to terminate this Lease upon thirty (30) day written notice to Landlord if the Premises or the Shopping Center are not restored to a condition equivalent to before the taking or if Landlord fails to complete repairs to the Premises and the Shopping Center within one hundred eighty (180) days after the date of any taking; and all Rent shall equitably abate after the occurrence of the taking, considering the taken area, the nature and extent of interference to Tenant's ability to conduct business and the need for access and essential services.   Until the completion of restoration of the Premises and the Shopping Center by Landlord to a condition reasonably allowing Tenant to fully operate its business, all Rent shall be completely abated.

Landlord reserves all rights to the entire damage award or payment for any taking by eminent domain, and Tenant shall make no claim whatsoever against Landlord for damages for termination of its leasehold interest in the Premises or for interference with its business. Tenant shall, however, have the right to claim from the condemning authority all compensation that may be recoverable by Tenant on account of any loss incurred by Tenant, including, but not limited to, loss due to removing Tenant's merchandise, furniture, trade fixtures, and equipment or for damage to Tenant's business, loss of business, and/or loss of leasehold interest as well as any moving and relocation costs.

## 16.   SUBORDINATION, ATTORNMENT AND ESTOPPELS.

Tenant accepts this Lease subject and subordinate to any mortgage presently existing or hereafter placed upon the Shopping Center, and to all the renewals and extensions thereof, subject to the condition, however, that so long as this Lease is in full force and effect and without any default on the part of Tenant, Tenant's rights to possession of the Premises shall not be affected or disturbed by any mortgagee in the exercise

of any of its rights irrespective of any foreclosure of the mortgage. Tenant agrees to attorn to the mortgagee or any other successor in interest and, upon the request of Landlord or any mortgagee, to execute such documents as shall reasonably be requested to confirm the subordination and attornment.

Tenant agrees from time to time, upon the request of Landlord, to execute and deliver to Landlord a written statement addressed to Landlord (or to a party designated by Landlord), which statement shall identify Tenant and this Lease, shall certify that this Lease is unmodified and in full force and effect, or if there have been modifications, that the same is in full force and effect as so modified), shall confirm that Landlord is not in default as to any obligation of Landlord under this Lease and shall confirm Tenant's agreements contained in this Section 16 and shall contain such other information or confirmations as Landlord may reasonably require. Landlord is hereby irrevocably appointed and authorized as the agent and attorney-in-fact to Tenant to execute and deliver any such written statement on Tenant's behalf if Tenant fails to do so within seven (7) days after the delivery of a written request from Landlord to Tenant.

**17.    SURRENDER OF PREMISES.**  On the last day of the Lease Term, or on the sooner termination thereof, Tenant shall peaceably surrender the Premises in good condition and repair, ordinary wear, tear and casualty damage excepted, consistent with Tenant's duty to make repairs as herein provided. On or before the last day of the Lease Term, or the date of sooner termination thereof, Tenant shall, at its sole cost and expense, remove all merchandise, trade fixtures and equipment from the Premises, and all property not removed shall be deemed abandoned. All modifications, improvements, alterations, additions, and fixtures, other than Tenant's trade fixtures and equipment, which have been made or installed by either Landlord or Tenant upon the Premises shall remain the property of Landlord and shall be surrendered with the Premises as part thereof. Tenant shall promptly surrender all keys to the Premises to Landlord at the place then fixed for the payment of Base Rent and shall inform Landlord of combinations to any vaults, locks, and safes left on the Premises. In no event shall Tenant be required to remove the initial Tenant Improvements.

In the event Tenant remains in possession of the Premises after expiration of this Lease, and without the execution of a new Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month subject to all the provisions, conditions, and obligations of this Lease insofar as the same can be applicable to a month-to-month tenancy, except that Base Rent shall be escalated to one hundred fifty percent (150%) of the Base Rent payable by Tenant immediately prior to the expiration of this Lease.

**18.    RULES AND REGULATIONS.**  Landlord may from time to time adopt reasonable and nondiscriminatory rules and regulations governing the Common Area. Any rules and regulations shall be uniformly applied and not in conflict with this Lease. The violation of a rule or regulation shall be considered a default unless the rule or regulation requires Tenant to contribute monetarily to a merchants' association or otherwise increases Tenant's obligations or liabilities under this Lease.

**19.    QUIET ENJOYMENT.**  Tenant, upon fully complying with and promptly performing all of the terms, covenants, and conditions of this Lease on its part to be performed, and upon the prompt and timely payment of all sums due hereunder, shall have and quietly enjoy the Premises and enjoy all rights herein granted without interference for the Lease Term set forth herein.

**20.    SIGNS.**  Except for Tenant's signage originally constructed by Tenant as part of Tenant's Work, Tenant shall not place or suffer to be placed on the exterior walls or the roof of Premises any sign, awning, canopy, marquee, advertising matter, decoration, letter, or other thing of any kind without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. If so provided in Section 1, Tenant

13

shall have the right during the Lease Term, at Tenant's expense, to erect, operation, maintain, repair, replace and remove a sign panel on any one of Landlord's pylon or monument signs for the Shopping Center in accordance with the terms hereof.

**21.     HAZARDOUS MATERIALS.**  Landlord represents and warrants that there are no Hazardous Materials (as hereinafter defined) in, on, under or about the Premises or the Shopping Center; that there are no violations of environmental and health and safety laws and regulations; there are no liens imposed by any federal, state or local government for environmental costs; there are no consent decrees compliance orders or administrative orders regarding the Shopping Center and operations thereon; there are no physical or legal restrictions or limitations on the use of the Shopping Center to eliminate or minimize potential exposures to Hazardous Materials, including restrictive covenants, easements, equitable servitudes, or other deed restrictions; all environmental related documents within Landlord's possession or control regarding the Shopping Center have been delivered to Tenant. Except for Hazardous Materials (as hereinafter defined) used in Tenant's normal business operations, but then only in such quantities as allowed under and subject to all applicable laws, neither Tenant nor Tenant's agents or contractors shall, without Landlord's prior written consent, which consent may be withheld or conditioned within Landlord's discretion, keep on or around the Premises for use, handling, transport, disposal, treatment, generation, storage, or sale, any Hazardous Materials. Hazardous Materials shall mean the following: hazardous materials, toxic wastes, toxic substances, pollutants, biotoxins, indoor contaminants, mold, petroleum products, underground tanks, oils, pollution, radon, asbestos, asbestos containing materials, PCB's, other materials or contaminants hazardous, dangerous or risking harm to people or property, including, without limitation, those materials as those terms are commonly used or as defined by federal, state, and/or local law or regulation related to protection of health or the environment.

Tenant shall be liable to reimburse Landlord for any and all reasonable and necessary clean-up costs and other charges, fees, or penalties (civil and criminal) imposed by any governmental authority to the extent they relate to Tenant's use or transportation of Hazardous Materials in its operations of the Premises in violation of applicable laws. Tenant shall defend, indemnify, and hold Landlord harmless from and against any and all costs, fees, penalties, and charges assessed against, incurred by, or imposed upon Landlord (as well as Landlord's reasonable attorneys' and consultants' fees and costs) as a result of Tenant's use or transportation of Hazardous Materials in its operation of the Premises. Upon Tenant's uncured default under this section, Landlord shall be entitled to terminate this Lease immediately, and recover any and all actual damages associated with the default. The provisions of this Section 21 shall survive the expiration or earlier termination of this Lease.

**22.     SECURITY DEPOSIT**

If Section 1 provides for a Security Deposit, Tenant shall deposit the amount thereof with Landlord prior to the Delivery Date as security for the performance by Tenant of all of the terms of this Lease Landlord may retain the Security Deposit and may use or apply the whole or any part thereof to the extent required for the payment of any Rent or other sum with respect to which Tenant is in default hereunder or for the payment of any amount which Landlord may be required to expend by reason of Tenant's default hereunder. Tenant acknowledges that the Security Deposit is not an advance payment of rent nor a measure of Landlord's damages and shall in no event excuse the timely payment of any amount payable hereunder. Tenant shall not be entitled to the return or particular application of the Security Deposit until the full term of this Lease has expired, and then only to the extent not applied by Landlord as permitted herein. If prior to the expiration of the Lease Term, Landlord expends any portion of the Security Deposit as permitted herein, Tenant shall, if so requested by

14

Landlord, deposit with Landlord within ten (10) days after written demand therefor, an amount sufficient to restore the Security Deposit to its original amount.

**23.   ADDITIONAL PROVISIONS.**

(a)   **Recording.**  Tenant may record a Memorandum of Lease.  Tenant will pay all recording fees, costs, taxes, and other expenses for the recording.  Landlord shall execute such Memorandum of Lease within ten (10) days after written request by Tenant.

(b)   **Notices.**  Any notices required in accordance with any of the provisions herein, or desired to be given hereunder, if to Landlord shall be delivered personally, or by express or overnight courier, or if mailed, then mailed by certified mail, return receipt requested, and addressed to the address of Landlord as set forth in Section 1, or at such other place as Landlord may in writing from time to time direct to Tenant; and if to Tenant shall be delivered personally, or by express or overnight courier, or if mailed, then mailed by certified mail, return receipt requested, and addressed to Tenant as set forth in Section 1, or at such other place as Tenant may in writing from time to time direct to Landlord.  Notices shall be deemed given when delivered, if delivered personally or by express or overnight courier, upon receipt or rejection if sent by certified mail as set forth above.

(c)   **Waiver.**  The waiver by Landlord or Tenant of any term, covenant, or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition herein contained.  The subsequent acceptance of Base Rent, Additional Rent, or any other costs hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant, or condition of this Lease, other than the failure of Tenant to pay the particular sum so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such sum.

(d)   **Time.**  Time is of the essence in regard to this Lease and each and all of its provisions in which performance is a factor.

(e)   **Choice of Law.**  This Lease shall be governed by the laws of the state in which the Premises are located.

(f)   **Legal Expenses.**  If either party is required to bring or maintain any action (including assertion of any counterclaim, cross-claim, or claim in a proceeding in bankruptcy, receivership, or any other proceeding instituted by a party hereto or by others), or otherwise refers this Lease to an attorney for the enforcement of any of the covenants, terms, or conditions of this Lease, the prevailing party in such action shall, in addition to all other payments required herein, receive from the other all the costs incurred by the prevailing party at and in preparation for. arbitration, trial, appeal, review, and proceedings in bankruptcy court, including, but not limited to, matters unique to bankruptcy, including, but not limited to, such costs and reasonable attorneys' fees.

(g)   **Interest.**  All Rent and other amounts provided to be paid by Tenant to Landlord which are not paid within ten (10) days after due date shall bear interest at the rate of twelve percent (12%) per annum until paid in full.

(h)   **Landlord's Security Interest.**  To secure the payment of all Rent and other amounts payable by Tenant to Landlord, the Tenant grants to Landlord a security interest in all trade fixtures, inventory, and

equipment of Tenant located at the Premises from time to time and authorizes Landlords in its name alone to execute and file such financing statements as Landlord deems necessary to perfect or continue the perfection of this Security Interest.

(i)     **Landlord's Access.**   Landlord shall have the right to access the Premises at all reasonable times following reasonable notice for purposes of inspecting the same and making necessary repairs or replacements. In addition, such right of access at reasonable times and upon reasonable notice shall include, during the last nine (9) months of the Lease Term the right to show the Premises to prospective tenants.

(j)     **Counterparts.**   This Lease may be executed in multiple copies, each of which will be deemed an original, and all of such copies will together constitute one and the same instrument.

*{Signature Page to Follow}*

16

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date and year set forth below.

TENANT:                                           GUARANTOR:

**Petland Leaseholding Company, Inc.**            **PETLAND LEASEHOLDING COMPANY,**
                                                  **INC., an Ohio Corporation.**

By: _____                       By: _____

Name: Greg Hudson                                 Name: Greg Hudson

Title: Treasurer                                  Title:  Treasurer

Date: 5/13/09                                      Date: 5/13/09


LANDLORD:

**CHAPEL RIDGE INVESTMENTS, LLC**

By: _____

Name: _____

Title: _____

Date: _____

17

## **EXHIBIT A**

### Site Plans





CHAPEL RIDGE

19

## **EXHIBIT B**

Description of Landlord/Tenant Work

<u>Landlord Work</u>:  Landlord to deliver space "as is" on the Delivery Date.  Landlord shall warrant that all Mechanical equipment is in good working order.

<u>Tenant Work</u>:  All work needed to complete Tenant's fit-out and open for business.

20

## CORPORATE GUARANTEE

As an inducement to the above-referred and attached Lease entered into by___**CHAPEL RIDGE INVESTMENTS, LLC**___, as Landlord, and ___**PETLAND LEASEHOLDING COMPANY, INC., an Ohio Corporation**___, hereinafter referred to as Guarantor, does hereby personally guarantee to Landlord, its successors and assigns, the full payment of principal, interest, and all other monies due and owing under the above Lease. This guarantee is a guarantee of payment and not a guarantee of collection. This guarantee is absolute and unconditional. Upon default in any payment obligation by Tenant, after notice given to Tenant of such default, Landlord may proceed against Guarantor without resort to Tenant. Guarantor hereby waived presentment, demand, protest, and any other condition precedent to its liability under this guarantee upon default. Guarantor hereby consents to any extensions, amendments, renewals, refinancings, or waivers given to or by Tenant under the Lease without advance knowledge or approval by Guarantor. Guarantor agrees that this Guarantee shall remain in full force and effect in the event the Lease is sublet by Tenant, assigned by Tenant to any assignee, or assumed by a successor in interest of Tenant, regardless of whether or not such assignment, sublet, or assumption by a successor in interest is subject to Landlord's prior approval. Any proceedings against Tenant shall not release any rights against the Guarantor, and conversely, proceedings against the Guarantor shall not be construed as releasing any rights that Landlord may have against Tenant. Failure on the part of Landlord to preserve any rights which it may have shall not constitute a defense to the Guarantor under any changes in the composition or legal capacity of any of the parties to this Guarantee, or the Lease, including but not limited to any legal disability on the part of the Tenant. It is further understood and agreed that this Guarantee shall be construed to apply to Tenant incurred obligations during any term of the above referred Lease, primary as well as options, if any, as well as during any month to month or holdover tenancy occupation of Tenant. In the event of any dispute concerning the Lease or this Guarantee, Guarantor hereby consents to the jurisdiction of the Courts of the State of Indiana, and County in which the leased premises exists.

Dated this _13_ day of ____May____, 2009

GUARANTOR: **PETLAND LEASEHOLDING COMPANY, INC., an Ohio Corporation.**

By: _____
Print: Greg Hudson

Title: Treasurer

WITNESS my hand and Notarial Seal this _13th_ day of _May_____, 2009.

Resident of _Jackson_ County, Ohio

My commission expires: _12-02-2013_

Signature of Notary Public

_Lorenda Oberholzer_
Printed Name of Notary Public



**EXHIBIT**

"B"

March 5, 2013

Petland Leaseholding Company, Inc.
c/o Greg Hudson, Treasurer
250 Riverside Street
Chillicothe, OH 45601-5606

Lorenda Oberholzer
250 Riverside Street
Chillicothe, OH 45601-5606

**Re:    Breach of Shopping Center Lease ("Lease") Between Chapel Ridge Investments, LLC ("Landlord") and Petland Leaseholding Company, Inc. ("Tenant") dated May 13, 2009**

Dear Ms. Oberholzer and Mr. Hudson:

Please be advised the above captioned law firm represents the Landlord with regard to the Tenant's default of the Lease.

Specifically, the Tenant vacated the Premises on or about January 28, 2013, and ceased paying rent and other obligations, set forth in the Lease, on or about December 7, 2012. As such, the Tenant is in default of the Lease.

Pursuant to Article 13 of the Lease, the Tenant is hereby given fifteen (15) days within which to bring the rent and other obligations, set forth in the Lease, current in the amount of $63,240.01, as of February 28, 2013. Failure of the Tenant to cure these defaults, will entitle the Landlord to exercise any and all remedies set forth in Article 13 of the Lease.

In addition to the remedies set forth in the Lease, the Landlord will pursue all other remedies provided by the laws of the state of Indiana, including, but not limited to, asserting that the officers and directors of the Tenant are personally liable.

HAWK, HAYNIE, KAMMEYER & CHICKEDANTZ

Thomas M. Gallmeyer

TMG/skk
cc:    Joy Neuenschwander



**EXHIBIT**

"C"